HEATHER THEOBALD, Individually
And as the Executrix of the Estate of
EVELYN AMEROSA, Deceased;
JAMES OKEY; JAMIE SHEEHY and
CYNTHIA L. BICK, Individually and as
Co-Administratrices of the Estate of
FRANK AMEROSA, Deceased; and
BARBARA POST CAMPBELL,
Individually and as Executrix of the
Estate of JOHN NEWMAN
CAMPBELL, Deceased,

   Plaintiffs,

   v.


PIPER AIRCRAFT, INC., and PIPER
AIRCRAFT CORPORATION c/o

THE PIPER AIRCRAFT CORPORATION
IRREVOCABLE TRUST c/o HOWARD BERLIN
TRUSTEE FOR THE PIPER AIRCRAFT
CORPORATION IRREVOCABLE TRUST

and S-TEC CORPORATION,

  Defendants.

_____/

## ORDER GRANTING DEFENDANT PIPER
## AIRCRAFT INC.'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court on Defendant Piper Aircraft, Inc.'s ("Piper") Motion for Summary Judgment.[1] *See* DE 98. Plaintiffs responded, DE 111, and Piper replied, DE 128. The Court held a hearing on March 21, 2018. Having considered all relevant filings in this matter, Piper's Motion for Summary Judgment [DE 98] is **GRANTED**.

## I.     BACKGROUND[2]

This case arises from the crash of an aircraft manufactured by Piper Aircraft Corporation ("PAC") for which Piper is the type certificate holder. According to the Plaintiffs, the aircraft crashed because the stabilator, a part of the aircraft, was defective.

In 1978, PAC manufactured a PA-34-200 Seneca aircraft, Registration No. N31743. DE 98-1 ¶ 1.[3] PAC sold and shipped the aircraft to Melridge Aviation Company in Washington in 1978. *Id.* ¶ 9. According to Plaintiffs:

> By way of general background, the wings of the Seneca II create an upward lift as the engines propel the aircraft forward. The aircraft's tail provides a downward lift to keep the aircraft balanced over its center of gravity. Without the downward lift provided by the tail, the weight of the aircraft's nose would cause it to pitch nose downward. The horizontal tail of the Seneca II is a moveable stabilator that uses a moveable servo trim tab. The trim tab works to decrease the amount of force a pilot needs to exert on the yoke to move the stabilator to pitch the aircraft up and down. The trim tab provides additional stability between the pilot's input and the aircraft's reaction. One of the many design considerations of an aircraft is to make it immune from aerodynamic flutter within its flight envelope. *See e.g.* 14 C.F.R. 23.629. Aerodynamic flutter is the instability in an aircraft control surface caused by rapid cyclic movements that increase in intensity. At all times relevant to the design and certification of the Seneca, Piper was to design against

---

[1] Only Defendant Piper Aircraft, Inc. has moved for summary judgment. Plaintiffs state that they "have reached settlement agreements with all parties to the various actions, with the exception of Piper Aircraft, Inc. Those agreements, however, must be approved by the various courts they were filed in, as well as the courts where the Estates were initially raised. . . . As it pertains specifically to this litigation, the Piper Trust and S-Tec have reached agreements with the Plaintiffs to settle the claims between them. However, the approvals are not final. Dismissal can occur once settlements are approved." DE 142 at 1–2.

[2] The Court uses the pagination generated by the CM/ECF filing system, which appears as a header on all court filings.

[3] The facts in this section are undisputed, unless indicated otherwise.

aerodynamic flutter is to reinforce the strength of the tail. . . . It lacks internal support ribs and structure, and this "limited rigidity" allows divergence and bending causing flutter.

DE 111 at 8–9. According to a report by Plaintiffs' expert Allen J. Fiedler, the stabilator trim bushings were replaced in 2000, DE 111-16 at 10, and the stabilator bushings and bearings were replaced as part of the annual inspection on January 1, 2010, *id.* at 18. By 2013, the aircraft was owned by Campbell Associates at Curtiss Aero Inc. of Stamford, Connecticut. DE 98-1 ¶ 16. John Campbell was the principal of Campbell Associates and was the sole operator of the aircraft. DE 111-1 ¶ 16.

In 2012, Frank Amerosa was diagnosed with brain cancer. DE 98-1 ¶ 17. Mr. Amerosa lived in New York with his wife, Evelyn Amerosa, and was receiving cancer treatments in Boston, Massachusetts. *Id.* ¶ 18. The Amerosas would sometimes drive from New York to Boston for Mr. Amerosa's treatments; sometimes they would fly through Angel Flight, which provides flights for patients needing medical treatment. *Id.* On May 24, 2013, Mr. Campbell was piloting the plane from Massachusetts to New York with the Amerosas as passenger, *id.* ¶ 19–20, after Mr. Amerosa had received medical treatment in Boston, *id.* ¶ 21. The aircraft crashed near Johnstown, New York, *id.* ¶ 22, and all three individuals on board perished in the crash, *id.* ¶ 23. Plaintiffs allege that the crash was caused by a flutter event and a failure of the tail and stabilator of the aircraft. DE 111 at 11–12. According to Plaintiffs, this crash has similarities to other crashes involving Piper aircrafts. *Id.* at 10. Plaintiffs explain the cause of this crash and others by stating that "once the vibration, rotation and bending starts, there is insufficient damping and stiffness to stop it and within microseconds the Seneca stabilator bends due to lack of adequate structure comes off the airplane causing the nose to suddenly pitch down, the wings tear off and the airplane plummets to the earth." *Id.*

In 1991, PAC filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States District Court for the Southern District of Florida. DE 98-1 ¶ 10. The bankruptcy was resolved in 1995. *Id.* ¶ 11. As part of the resolution, Piper was created and the type certificate for the Seneca aircraft was later transferred to Piper. *Id.*

Plaintiffs allege that, "[t]hroughout the period of time in which Piper was the type certificate holder for the Seneca, as well as the related stabilator-equipped aircraft, it became aware of the dangerous defects which caused a rate of in-flight breakups which was far greater than any other and which presented common signs of flutter." DE 111 at 18. Plaintiffs present expert reports by Douglas Herlihy and Colin Sommer that state that, due to the other accidents, Piper was put on notice of the susceptibility of its stabilator equipped aircraft to suffer from in-flight breakups. *See* DE 111 at 18. Plaintiffs also present the report of their expert Erwin Tescher who critiques the manner in which Piper performed some its studies on the impact of flutter on its aircrafts. DE 111-6. According to Plaintiffs, Piper did not disclose to the FAA that these accidents were occurring due to flutter. *Id.*

Plaintiffs are the survivors of the Amerosas and Mr. Campbell and are suing on behalf of themselves and as the administrators of the estates. They filed their Amended Complaint on November 17, 2016, alleging the following counts against Piper: strict liability in tort (Count V); negligence (Count VI); breach of express and implied warranties (Count VII); and fraud, misrepresentation, concealment (Count VIII). Defendant Piper has moved for summary judgment. DE 98.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247–48). A fact is material if "it would affect the outcome of the suit under the governing law." *Id.* (citing *Anderson*, 477 U.S. at 247–48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007). Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment. *See id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving

party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party. *See Shiver*, 549 F.3d at 1343.

## III.    ANALYSIS

Piper argues that both Florida's statute of repose and the General Aviation Revitalization Act ("GARA"), a federal statute of repose, bar the Plaintiffs' claims. The Court will first address the Florida statute of repose and then address the General Aviation Revitalization Act.[4]

### I.    The Florida Statute of Repose

Florida has a statute of repose which provides that "[u]nder no circumstances may a claimant commence an action for products liability, including a wrongful death action or any other claim arising from personal injury or property damage caused by a product, to recover for harm allegedly caused by a product with an expected useful life of 10 years or less, if the harm was caused by exposure to or use of the product more than 12 years after delivery of the product to its first purchaser or lessee who was not engaged in the business of selling or leasing the product or of using the product as a component in the manufacture of another product." Fla. Stat. § 95.031(2)(b). For "[a]ircraft used in commercial or contract carrying of passengers or freight" the Florida statute of repose states that "no action for products liability may be brought more than 20 years after delivery of the product to its first purchaser or lessee who was not engaged in the business of selling or leasing the product or of using the product in the component in the

---

[4] In its motion for summary judgment, Piper raised several other arguments for why Plaintiffs' claims are barred. *See* DE 98. Piper also raises the following arguments: Plaintiffs' claims are barred under the Bankruptcy Court's Channeling Injunction and Confirmation Order; Plaintiffs' failure to warn claims fail because Plaintiffs allege a design defect that cannot be corrected by a warning and any design change would require FAA approval; and Plaintiffs' warranty-based claims are barred for lack of privity. Because the Court finds that Plaintiffs' claims are barred by the Florida statute of repose, or alternatively by the General Aviation Revitalization Act, the Court does not reach these alternative arguments.

manufacture of another product." Fla. Stat. § 95.031(2)(b)(3). Thus, the repose period is either 12 years or 20 years. Under either repose period, more time than the repose period has elapsed since the original sale of the aircraft to bar Plaintiffs' claims. The aircraft was sold in 1978, DE 98-1 ¶ 9, and Plaintiffs brought this action in 2016, *see* DE 1.

The repose period, however, "is tolled for any period during which the manufacturer through its officers, directors, partners, or managing agents had actual knowledge that the product was defective in the manner alleged by the claimant and took affirmative steps to conceal the defect. Any claim of concealment under this section shall be made with specificity and must be based upon substantial factual and legal support." Fla. Stat. § 95.031(2)(d).

Piper argues that Plaintiffs cannot offer any evidence that Piper had actual knowledge of the defect and took affirmative steps to conceal it. DE 98 at 23. Piper argues that Plaintiffs, at most, "allege that the design of the stabilator was defective and should have been improved, but this is insufficient to meet their burden." *Id.* Plaintiffs respond that the Florida statute of repose should be tolled.[5] They argue that

> [t]hroughout the period of time in which Piper was the type certificate holder for the Seneca, as well as the related stabilator-equipped aircraft, it became aware of the dangerous defects which caused a rate of in-flight breakups which was far greater than any other and which presented common signs of flutter. (See Ex. I at p. 13-16; Ex. G at 22-23). Instead of disclosing to the FAA and the public that these accidents were occurring due to flutter, it misrepresented to the FAA and public information. Rather than correct the problems, it shifted blame to pilots who could not defend themselves. (See *Id.*). It further failed to provide this information to pilots in accordance with its obligations as the type certificate holder and pursuant to Federal law's requirements for continuing airworthiness. Its withholding of this information is a factual question for a jury.

---

[5] In their response, Plaintiffs state that the Florida statute of repose should be tolled for the same reasons that GARA's Misrepresentation Exception should apply. DE 111 at 21. The GARA Misrepresentation Exception is discussed *infra*.

DE 111 at 18. The only evidence Plaintiffs cite is the reports of their experts, Douglas Herlihy and Colin Sommer. *See id.* The Herlihy report states that there have been other accidents of stabilator-equipped Piper aircrafts. *See* DE 111-10 at 13–17. Similarly, the Sommer report lists other accidents involving Piper aircrafts and concludes that "[b]ased upon our review of the above accidents and the subject accident, Piper was put on notice of the susceptibility of its stabilator equipped aircraft to suffer from inflight breakups, even when the aircraft is operating within the flight envelope. Piper has not disclosed the defects that have caused these ongoing accidents and failed to make the necessary changes to stop them from occurring." DE 111-8 at 24.

During the hearing, Plaintiffs cited to the report of their expert, Erwin Tescher, to argue that Piper had actual knowledge that its stabilator-equipped aircrafts were susceptible to in-flight breakups. Mar. 21, 2018 Hr'g Tran. at 34–35. Specifically, Plaintiffs cited to paragraph 7 of Tescher's report which states that "[l]ong ago (1990), as a result of many in-flight break-ups involving the PA-28, PA-32, and the PA-34 series of aircraft, a repeat flutter margin analysis was performed on the PA28 and PA-32 aircraft. The conclusion was reached that the flutter margins are still questionable with the stabilator fail designs inherent in the PA-28, PA-32, and PA-34 series aircraft." DE 111-6 at 14. During the hearing, Plaintiffs did not cite to any evidence of Piper's actual knowledge: they simply said that PAC had conducted flutter analyses which yielded "questionable" results and that there were other accidents alleged to have been caused by flutter events. Mar. 21, 2018 Hr'g Tran. at 76–77. The Court summarized what it believed to be Plaintiffs' argument that Piper had actual knowledge. The Plaintiffs agreed with the Court's summary which is as follows:

I am understanding your argument that there was a flutter analysis that was commenced during a period of time prior to when Piper owned the -- came into existence, came into existence, and that suggested this, as Tescher calls it, the flutter margins are still questionable. That is in existence before Piper comes into existence. That analysis is conducted. And then when Piper comes into existence, there are in-flight breakups and so, the actual knowledge that Piper has, according to the Plaintiff, is that when you take the pre Piper -- now 1990 flutter margin analysis with margins -- flutter margins that are questionable, and then when you come into existence, and you have these in-flight breakups, that you put those two things together and that is what gives Piper the actual knowledge.

Mar. 21, 2018 Hr'g Tran. at 76–77.

The Plaintiffs' claims are barred under Florida's statute of repose because the evidence upon which Plaintiffs rely does not support their argument that Piper had actual knowledge that its stabilator-equipped aircraft were susceptible to in-flight breakups. Plaintiffs' experts only state that Piper should have been on notice of the problem with its aircrafts. *See, e.g.*, DE 111-8 at 24 ("Based upon our review of the above accidents and the subject accident, Piper was put on notice of the susceptibility of its stabilator equipped aircraft to suffer from inflight breakups, even when the aircraft is operating within the flight envelope. Piper has not disclosed the defects that have caused these ongoing accidents and failed to make the necessary changes to stop them from occurring."). Plaintiffs' experts' reports do not point to any evidence to show that Piper had actual knowledge of any problem with the stabilator in its aircrafts and prior accidents do not show that Piper had actual knowledge of any problem with its aircrafts. They do not state that any officer, director, partner, or managing agent knew of any problem with the stabilator in the aircraft. Rather, Plaintiffs ask the Court to conclude that Piper had actual knowledge based on their experts' conclusions that Piper had constructive knowledge. Additionally, Plaintiffs do not offer any evidence of affirmative steps taken by anyone at Piper to conceal the alleged defect with the stabilator in Piper's aircrafts. Because Plaintiffs fail to cite to a single person at Piper who had actual knowledge of any problem with the stabilator or to any affirmative steps taken by

anyone at Piper to conceal the alleged defect, their claims are barred under Florida Statute §

95.031(2)(d).

This case has similarities to *Romero v. Toyota Motor Corp.*, 916 F. Supp.2d 1301 (S.D.

Fla. 2013),[6] a case cited by Piper. In *Romero*, the plaintiffs alleged that defendant Toyota should

have been on notice of the weak roof in its vehicle that was susceptible to damage during

rollovers based on testing that had been performed on the car. *Id.* at 1304–05. In finding that

these allegations were insufficient to meet the exception to the Florida statute of repose, the

Court said:

> what Toyota could have discovered or should have understood from the dolly
> rollover tests—short of what it actually interpreted them to mean—is not relevant
> to the issue of Toyota's actual knowledge in a repose context. . . . No one at
> Toyota indicated that the tests put the company on notice of a flaw that could
> cause injury or subject it to a claim like the one at bar. Plaintiffs' expert could not
> testify as to what Toyota actually knew and there was no other evidence that

---

[6] The Court notes that *Romero* was in a different procedural posture than the instant case. In that case, Plaintiffs on summary judgment had presented sufficient evidence that Toyota had actual knowledge of a defect in its car and that it had taken affirmative steps to conceal the defect. Plaintiffs presented evidence of

> internal roll-over tests showing that Toyota knew the Four Runner was capable of
> overturning at 35 miles-per-hour through steering input alone; a jury verdict
> finding a design defect in the subject Four Runner; and evidence that the model
> was subsequently redesigned specifically to improve roll-over resistance (which
> was accomplished, as proven through subsequent testing). As evidence of
> concealment, Plaintiffs presented the testimony of an advertising executive who
> stated that Toyota does not communicate a roll-over propensity to the public
> because it would be "impossible" for Toyota to do so; product brochures
> illustrating vehicular moves that Toyota's representative was unsure the SUV
> could make without rolling over; and a warning label that might not have
> adequately disclosed the product's potential risks.

*Romero*, 916 F. Supp.2d at 1304–05. In its reply to its motion for summary judgment, Toyota argued that this evidence show its vehicle's propensity to rollover from abrupt maneuvers, not any actual knowledge or attempts to conceal the issue of a week roof which was at issue in the case. *Id.* at 1305. Because Toyota made that argument for the first time in its reply to its motion for summary judgment, the Court declined to consider it. *Id.* Following the trial, Toyota again made the argument that Plaintiffs had not introduced evidence of its actual knowledge and attempts to conceal a defect with the strength of the roofs of its vehicle. *Id.* at 1306. The Court granted the renewed motion for judgment as a matter of law.

Toyota perceived a problem. . . . Toyota's negligence, even if supported by the record, does not equate to its knowledge of a specific defect.

*Id.* at 1311. After finding that plaintiffs had not shown that defendant had actual knowledge of the defect, the Court stated that "[a] second requirement of the statute of repose is that the manufacturer conceal the defect. It is axiomatic that '[o]ne cannot conceal what one does not know.'" *Id.* at 1313 (citations omitted).

As in *Romero*, the Plaintiffs here do not have evidence that the Defendant had actual knowledge of any problem with the stabilator in its aircrafts. Plaintiffs' experts conclude that Piper should have been on notice that its stabilator-equipped aircrafts were susceptible to in-flight breakups, DE 111-8 at 24, and one of their expert reports alleges that PAC had conducted tests of the stabilator and concluded that the "flutter margins [were] questionable," DE 111-6 at 14. Like the plaintiffs in *Romero* who relied on Toyota's own tests of its vehicles, the Plaintiffs in this case make allegations about what Piper should have known or what Piper could have concluded based on testing; this, however, is not evidence that Piper had actual knowledge of any defect with its aircrafts. In addition to the lack of evidence of Piper's actual knowledge, the Plaintiffs also present no evidence of affirmative steps taken by Piper to conceal the alleged defect in the stabilator. Accordingly, Plaintiffs' claims are barred under Florida's statute of repose because they have not offered evidence that any of Piper's officers, directors, partners, or managing agents had actual knowledge that the product was defective and took affirmative steps to conceal it, as required for the statute of repose to be tolled under Florida Statute § 95.031(2)(d).

II.     The Statute of Repose Under the General Aviation Revitalization Act

Defendant also argues that Plaintiffs' claims are barred under the General Aviation Revitalization Act ("GARA"). GARA provides an 18-year statute of repose on claims against manufacturers of general aviation aircrafts unless one of several statutory exceptions applies or GARA's Rolling Provision applies to restart the repose period. *See* Pub. L. No. 103-298, 108 Stat. 1552 (hereinafter "GARA") §§ 2(a), 3. The parties agree that GARA would bar Plaintiffs' claims unless one of the exceptions or the Rolling Provision applies. *See* DE 111 at 10 ("The only issue in dispute is whether one or more of the exceptions should apply to Plaintiffs' claims.").

Plaintiffs argue that there are two exceptions that remove Plaintiffs' claims from the statute of repose under GARA. First, they argue that the "Misrepresentation Exception" applies and second, they argue that the "Medical Emergency Exception" applies. Finally, they argue that GARA's "Rolling Provision" applies to restart the repose period. The Court will address each argument in turn.

a.   The Misrepresentation Exception to GARA

Plaintiffs argue that "Piper is not entitled to relief under GARA due to its concealment and withholding of the cause of this accident and the other similar ones." DE 111 at 15. GARA's Misrepresentation Exception provides that the 18-year statute of repose does not apply:

> if the claimant pleads with specificity the facts necessary to prove, and proves, that the manufacturer with respect to a type certificate or airworthiness certificate for, or obligations with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft *knowingly misrepresented* to the Federal Aviation Administration, or *concealed or withheld from the Federal Aviation Administration, required information* that is material and relevant to the performance or the maintenance or operation of such aircraft,

or the component, system, subassembly, or other part, that is *causally related* to the harm which the claimant allegedly suffered.

GARA § 2(b)(1) (emphasis added). To utilize the Misrepresentation Exception, "plaintiffs must prove: (1) knowing misrepresentation, or concealment, or withholding; (2) of required information that is material and relevant; (3) that is causally related to the harm they suffered." *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631, 646–47 (E.D. Pa. 2004) (quoting *Rickert v. Mitsubishi Heavy Indus., Ltd.*, 923 F. Supp. 1453, 1456 (D. Wyo. 1996)).

Plaintiffs rely on the same argument that they made as to why the Florida statute of repose should not bar their claims. They argue that:

> Throughout the period of time in which Piper was the type certificate holder for the Seneca, as well as the related stabilator-equipped aircraft, it became aware of the dangerous defects which caused a rate of in-flight breakups which was far greater than any other and which presented common signs of flutter. (See Ex. I at p. 13-16; Ex. G at 22-23). Instead of disclosing to the FAA and the public that these accidents were occurring due to flutter, it misrepresented to the FAA and public information. Rather than correct the problems, it shifted blame to pilots who could not defend themselves. (See *Id.*). It further failed to provide this information to pilots in accordance with its obligations as the type certificate holder and pursuant to Federal law's requirements for continuing airworthiness. Its withholding of this information is a factual question for a jury.

DE 111 at 18. Defendant argues that the Plaintiffs have not provided any evidence that Piper misrepresented or concealed any required information from the FAA. Defendant also argues that "Plaintiffs and their experts [have not] identified a statute or regulation that required Piper to provide this non-existent information to the FAA, any response to an inquiry to the FAA, or any basis to show some duty on the part of Piper to volunteer such information to the FAA that was necessary to correct any previous submission of information." DE 98 at 14.

There is no evidence in the record that Defendant knowingly misrepresented, concealed, or withheld from the FAA required information that is material, relevant, and causally related to the harm Plaintiffs suffered. *See Robinson*, 326 F. Supp. 2d at 646–47. As discussed with the

Florida statute of repose, the only evidence Plaintiffs cite in their response is the reports of their experts, Douglas Herlihy and Colin Sommer. *See* DE 111 at 18. The reports conclude simply that Piper should have been on notice of a problem with its stabilator because of other accidents. *See* DE 111-10 at 13–17; DE 111-8 at 24. At the hearing, Plaintiffs relied on the report of their expert, Erwin Tescher. Mar. 21, 2018 Hr'g Tran. at 12–16. Tescher's report critiques the manner in which Piper performed some its studies and states that "[t]he general impression I get after reviewing all of these Piper documentation(s) is that there is little concern given to ensuring that documentation is kept up to date, which leads to incorrect maintenance & servicing of the airplane. This also leads to and, in my opinion did, result in a breakdown in communication between the design community and the manufacturing community." DE 111-6 at 23. During the hearing, Plaintiffs' counsel noted that Piper, as the type certificate holder, had a continuing duty per various regulations to ensure airworthiness and inform the FAA of information that Piper had about problems with its aircrafts. Mar. 21, 2018 Hr'g Tran. at 20–21. This is true. However, Plaintiffs' counsel failed to point to a single instance where Piper had knowledge of any problem with its aircrafts and did not report it to the FAA, in violation of this duty.

Nothing in Plaintiffs' expert reports, either cited in the brief or during the hearing, show that Piper knowingly misrepresented, concealed, or withheld any information from the FAA. The reports go only so far as to say that Piper should have been on notice that its stabilator-equipped aircrafts were susceptible to in-flight breakups. Even Mr. Tescher's report, on which the Plaintiffs relied heavily during the hearing, concludes at most that Piper's testing could have been done in a better manner; it does not point "with specificity to the facts necessary" to show that Piper knowingly misrepresented, concealed, or withheld information from the FAA. *See* GARA § 2(b)(1). Stating simply that prior accidents should have put Piper on notice of a

problem with its aircrafts or that Piper could have conducted better tests of its aircrafts is insufficient to meet the requirements of the Misrepresentation Exception to GARA, as Plaintiffs do not point to a single instance where Piper had to disclose information and either did not or misrepresented that information to the FAA. Accordingly the Misrepresentation Exception does not apply to Plaintiffs' claims.

      b.  <u>The Medical Emergency Exception to GARA</u>

Plaintiffs argue that the GARA statute of repose does not bar their claims because of the Medical Exception to GARA. The Medical Exception states that the statute of repose does not apply "if the person for whose injury or death the claim is being made is a passenger for purposes of receiving treatment for a medical or other emergency." GARA § 2(b)(2).

According to Plaintiffs, this exception should apply to their case because "the purpose of this flight was to transport Mr. Amerosa to and from Boston for the purposes of medical treatment as part of the Angel Flight volunteer pilot program." DE 111 at 19. The Defendants argue that the exception does not apply. First, they argue that the exception clearly cannot apply to Mr. Campbell because he was the pilot and the exception is limited to "passenger[s]" of the plane. DE 98 at 15–16. Second, they argue that the exception does not apply to the Amerosas because, although they were travelling so that Mr. Amerosa could obtain treatment, Mr. Amerosa was diagnosed with cancer in 2012 and was not travelling for a medical emergency as required by the exception. *Id.* at 16–17.

The Medical Emergency Exception does not apply to Plaintiffs' case. First, the Court notes that this exception could apply only to Mr. Amerosa, not to Mrs. Amerosa or to Mr. Campbell. The exception applies only to passengers, *see* GARA § 2(b)(2), and Mr. Campbell, the pilot, was a flightcrew member, not a passenger, *see* 14 C.F.R. § 1.1 ("Flightcrew member

means a pilot, flight engineer, or flight navigator assigned to duty in an aircraft during flight time."). And neither Mr. Campbell nor Mrs. Amerosa was "a passenger for purposes of receiving treatment for a medical or other emergency." GARA § 2(b)(2) Plaintiffs conceded this at the hearing. Mar. 21, 2018 Hr'g Tran. at 45.

Second, the Court must interpret the statute to determine what Congress meant by the term "medical or other emergency" in order to determine whether Mr. Amerosa's claims fall under the exception. As the Plaintiffs note, the "the statute is silent on what medical or emergency treatment it contemplates." DE 111 at 19. At the hearing, Plaintiffs argued that the statute does not require that the passenger be flying for a medical *emergency*. They argued that "it is in the disjunctive. They would have said medical emergency if they meant it." Mar. 21, 2018 Hr'g Tran. at 38.

In interpreting the statute, the Court must begin with the text. *Ross v. Blake*, 136 S.Ct. 1850, 1856 (2016). The text requires that the passenger be travelling on the plane to receive "treatment for a medical or other emergency." *See* GARA § 2(b)(2). Plaintiffs' argument that the travel need not be for a medical emergency, but just for any medical treatment, is belied by the structure of the clause. If the clause "medical or other emergency" was to be read as Plaintiffs argue, "other emergency" could be removed from the statute and the statute should be grammatically sound. Plaintiffs would have the statute read "a passenger for purposes of receiving treatment for a medical." This reading does not make sense. Medical is an adjective and must modify something. In this exception, it modifies emergency.

Accordingly, the Court must define emergency in order to ascertain whether Mr. Amerosa was travelling for a medical emergency. Black's Law Dictionary defines "emergency"

as "[a] sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm." Additionally, the Medical Emergency Exception was "designed to provide additional protection to certain people who had no choice about being on the aircraft, such as accident victims being airlifted to a hospital for emergency treatment." Victor E. Schwartz & Leah Lorber, *The General Aviation Revitalization Act: How Rational Civil Justice Reform Revitalized an Industry*, 67 J. Air L. & Com. 1269, 1300 (2002).

Although Mr. Amerosa was on the plane for the purpose of receiving medical treatment, his treatment was not for a medical emergency, as required for the Medical Emergency Exception to apply. *See* GARA § 2(b)(2). Mr. Amerosa was diagnosed with a form of brain cancer in 2012, several months before the plane crash. DE 98-1 ¶ 17. The Amerosas were travelling from Boston, where Mr. Amerosa was receiving medical treatment, to their home in New York after Mr. Amerosa received medical treatment. *Id.* ¶ 18. The Amerosas were not on the aircraft because of a medical emergency; rather they were on the aircraft after Mr. Amerosa had sought medical treatment. The Medical Emergency Exception does not apply.

### c. GARA's Rolling Provision

GARA contains a Rolling Provision which restarts the 18-year statute of repose when there is a replacement or addition to the aircraft and that is alleged to have caused death, injury or damage. GARA § 2(a)(2). The Rolling Provision states that the statute of repose restarts after the installation of

> any new component, system, subassembly, or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage, after the applicable limitation period beginning on the date of completion of the replacement or addition.

*Id.* Plaintiffs make two different arguments about why the Rolling Provision applies. First, Plaintiffs argue that replacement parts used in the trim tab actuating system of the aircraft were replaced in 2010, restarting the 18-year statute of repose. Second, Plaintiffs argue that the Maintenance Manual issued by Piper was defective. Plaintiffs state that the replacement parts

> would have been installed according to the Maintenance Manual promulgated by Piper, and which Piper controls and has the duty to ensure its accurate, as part of their continuing airworthiness obligations under the Federal Aviation Regulations. After installation, and as part of routine maintenance, the freeplay would be set, which Mr. Tescher in his report and deposition establish is outside acceptable freeplay limits based upon the prevailing literature which has long been known and ignored by Piper. (Sessoms Dep. at pgs. 87-92). Had Piper issued non-defective literature about these components and freeplay, again this accident could have been avoided.

DE 111 at 20–21. Defendant argues that the Rolling Provision only applies to design defect claims when the design changes and Plaintiffs do not dispute that the replacement parts were not design changes. DE 128 at 6. Defendant also argues that Plaintiffs do not identify any new defective instructions and that a failure to correct a manual or instructions issued more than 18 years before the incident cannot restart the repose period. *Id.* at 7.

        i.    <u>Replacement Parts</u>

The installation of replacement parts can restart the statute of repose. The legislative history notes that the statute of repose only begins again against the entity that manufactured the replacement parts, not also against the manufacturer of the aircraft if they did not manufacture the parts. The House Judiciary Committee Report states that "[s]ince the bill provides for a 'rolling' statute of repose, victims and their families will have recourse against new component part manufacturers for a part installed subsequent to delivery in the event of a crash attributable to a structural defect or similar flaw in a new component part." H.R. Rep. No. 103-525, pt. 2

(1994). At the hearing, Plaintiffs acknowledged that the Rolling Provision restarts the statute of repose only against the manufacturer or supplier of the new parts. Mar. 21, 2018 Hr'g Tran. at 52.

Authorities differ on whether the new components must be substantively different from the prior components in order for the Rolling Provision to apply and to restart the repose period. The Ninth Circuit has said that "GARA's rolling provision applies where there has been a *substantive alteration* to the part that was alleged to have proximately caused the accident." *LaHaye v. Galvin Flying Serv. Inc.*, 144 F. App'x 631, 633 (9th Cir. 2005) (emphasis added). According to the Ninth Circuit, the Rolling Provision does not restart the statute of repose when the replacement component did not change the allegedly defective aspect of the component that caused the accident. *Id.* Other courts, however, have said that "[t]he 'rolling' provision clearly provides that the period for bringing a cause of action restarts each time a 'new' part replaces an old part and the 'new' part . . . is alleged to be the problem. The 'rolling' provision does not require that the part be newly designed, rather it only requires it to be a new part." *Crouch v. Teledyne Cont'l Motors, Inc.*, 833 F. Supp. 2d 1331, 1336 (S.D. Ala. 2011).

The Court need not take a position on whether replacement parts must be substantively different in order to restart the repose period because Plaintiffs' claim that the Rolling Provision restarts the repose period is flawed for two other reasons. First, Plaintiffs do not offer evidence that Piper manufactured the replacement parts and second they do not offer evidence that the replacement parts caused the accident. Plaintiffs argue that the statute of repose period should begin again because parts were replaced in the stabilator in 2010. According to the Fiedler Report, the stabilator trim bushings were replaced in 2000, DE 111-16 at 10, and the stabilator bushings and bearings were replaced as part of the annual inspection on January 1, 2010, *id.* at

18. The report does not state who manufactured these replacement parts. At the hearing, Plaintiffs could not point to any record evidence to show that the parts were manufactured by Piper and, as Plaintiffs conceded, there are part manufacturers besides Piper that make parts for Piper aircrafts. Mar. 21, 2018 Hr'g Tran. at 50–52. Plaintiffs argued simply that, because the report said that the parts were replaced with "new," *id.*, the parts were made by Piper. *Id.* at 54. The word "new" does not indicate that the parts were made by Piper rather than by any of the other parts manufacturers. Because the Rolling Provision applies only to the manufacturer of the new parts and Plaintiffs do not cite to any record evidence to show that Piper manufactured the replacement parts in the aircraft, the Rolling Provision does not restart the repose period.

Additionally, although Plaintiffs allege that the stabilator caused the in-flight breakup, DE 111 at 11–12, they do not offer evidence that the accident was caused by these replacement parts in the stabilator. The Rolling Provision requires that the Plaintiffs offer evidence that it was these new parts that caused the death, injury, or damage, in order to restart the repose period. *See* GARA § 2(a)(2). Plaintiffs concede that the cause of the accident was a design flaw that had existed in the aircraft since 1978. Pls.'s Resp. Def. Piper Aircraft, Inc.'s First Set Interrogs., DE 98-4 at 4 ("The design defects which are described above existed when the accident aircraft was first designed and manufactured"). At the hearing, Plaintiffs simply said that "those parts are required to bring the stabilator to the operational continuing airworthiness standard established by Piper . . . . Those parts replaced are as defective as the ones that were original." Mar. 21, 2018 Hr'g Tran. at 54. They offer no evidence that these replacement parts caused the accident. Rather, the argument is that the stabilator as a whole was defective. This is insufficient to restart the repose period under the Rolling Provision. *See* GARA § 2(a)(2).

ii.    <u>Revision to the Flight Manual</u>

A revision to a flight manual can implicate GARA's rolling provision if the manual revision is alleged to have caused the death, injury, or damage. *Caldwell v. Enstrom Helicopter Corp.*, 230 F.3d 1155, 1158 (9th Cir. 2000). The Ninth Circuit has stated that "if Defendant substantively altered, or deleted, a warning about the [defective parts] from the manual within the last 18 years, and it is alleged that the revision or omission is the proximate cause of the accident, then GARA does not bar the action." *Id.* In order to sustain a claim under this theory, plaintiffs must show an "affirmative deletion from or addition to the revised manual that causally contributed to the crash. Absent such a causal nexus between the replaced part and the complained of injuries, § 2(a)(2) does not operate to trigger a new period of repose." *Crouch v. Honeywell Intern., Inc.*, 720 F.3d 333, 343 (6th Cir. 2013). Additionally, the GARA limitation period may not be circumvented simply by labeling the claim as one for failure to warn." *Campbell v. Parker-Hannifin Corp.*, 69 Cal. App. 4th 1534, 1547 (Cal. App. 1999).

Plaintiffs' claim that the manual was flawed does not restart the repose period because Plaintiffs do not allege that the manual was altered or revised within the last 18 years. Plaintiffs state that the replacement parts "would have been installed according to the Maintenance Manual promulgated by Piper, and which Piper controls and has the duty to ensure its [sic] accurate, as part of their continuing airworthiness obligations under the Federal Aviation Regulations." DE 111 at 20–21. But Plaintiffs do not allege that the Maintenance Manual was altered at all in the past 18 years. Mar. 21, 2018 Hr'g Tran. at 56–57. In fact, they state the freeplay limits in the Maintenance Manuel are "outside acceptable freeplay limits based upon the prevailing literature which has long been known and ignored by Piper. . . . Had Piper issued non-defective literature about these components and freeplay, against his accident could have been avoided." *Id.* Thus,

Plaintiffs argue that the literature has been defective since it was written and do not point to a revision that could restart the repose period. This argument is similar to the argument the plaintiffs made in *Campbell*. In that case, the plaintiffs claimed that the aircraft manufacturer should be accountable for replacement parts that it did not manufacture. *Campbell*, 69 Cal. App. 4th at 1546–47. The California court said:

> [A]ppellants contend that Cessna should be accountable for the replaced vacuum pumps not as a manufacturer but on a failure to warn theory. Appellants claim that Cessna knew or should have known that the parts would not work and failed to issue any warning to aircraft owners or to the FAA Cessna asserts this claim should fail as a transparent attempt to circumvent GARA by artful pleading. GARA's legislative history supports Cessna's position. (6c) The House Judiciary Committee explained that the language "in its capacity as a manufacturer" is intended to insure that parties who happen to be manufacturers of an aircraft or a component part are not immunized from liability they may be subject to in some other capacity. For example, in the event a party who happened to be a manufacturer committed some negligent act as a mechanic of an aircraft or as a pilot, and such act was a proximate cause of an accident, the victims would not be barred from bringing a civil suit for damages against that party in its capacity as a mechanic. (Legis. hist., 1994 U.S. Code Cong. & Admin. News, at p. 1649.). . . we are still persuaded by its reasoning that the GARA limitation period may not be circumvented simply by labeling the claim as one for failure to warn. Appellants are still attempting to hold Cessna liable for actions connected with its role as manufacturer.

*Id.* Here, Plaintiffs claim that Piper failed to warn by not revising its Maintenance Manual. This claim must fail. Without an allegation that the Maintenance Manual was altered in the past 18 years and that the revision causally caused the accident, the Rolling Provision does not restart the repose period.

***

Accordingly, in the alternative to being barred by Florida's statute of repose, Plaintiffs' claims are barred by GARA.

### III.     CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant

Piper Aircraft Inc.'s Motion for Summary Judgment [DE 98] is **GRANTED**. All pending

motions are **DENIED AS MOOT** and the Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers in Fort Pierce, Florida this 30th day of March, 2018.

_____

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE